Argued January 25, affirmed March 16, petition for rehearing
denied April 11, petition for review denied
August 1, 1972

# EDWARDS, *Appellant, v.* STATE MILITARY
# DEPARTMENT ET AL, *Respondents.*
494 P2d 891

*Sam Kyle,* Albany, argued the cause for appellant. On the briefs were C. S. Emmons and Emmons, Kyle, Kropp & Kryger, Albany.

*Frederick L. Decker,* Albany, argued the cause for respondents. On the brief were Goode, Goode, Decker & Hinson, Albany.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

## LANGTRY, J.

Plaintiff was injured when an M2 self-propelled anti-aircraft weapon (commonly referred to as a tank) collided with the log truck he was driving. Plaintiff brought this action for personal injuries against the Military Department and the operator of the tank, defendant Strawn. The trial court sustained a demurrer to the complaint by the Military Department and the jury returned a verdict for defendant Strawn. Plaintiff appeals both judgments.

Plaintiff, while in the course of his employment, was driving a log truck in a southerly direction on a two-lane highway. Approaching from the opposite direction was a convoy of three tanks and a jeep returning from a Veterans' Day parade. When plaintiff's truck and defendant's tank were approximately 300 feet apart, the tank, in its steering, began experiencing a "mechanical lockup."[1] Defendant Strawn attempted to correct the difficulty by pulling back and forth on the T-bar (the steering control) while at the same time decreasing speed. The tank gradually drifted about six

---

[1] According to Captain Leighty of the National Guard this "lockup" is common to most tanks with which he was familiar. He explained that a T-bar controls the steering of the tank and is connected with the transmission by a mechanical linkage. Between the engine and the transmission is an oil coupling. As the tank increases its speed the steering linkage is controlled by oil pressure, with no mechanical connection between it and the engine. At a certain speed (which according to Leighty varied with each tank) a positive mechanical connection between the steering linkage and the engine replaces the fluid connection. This causes the steering to become more difficult, requiring more action on the T-bar to control the tank.

feet into the southbound (plaintiff's) lane. When the steering finally "broke loose" the tank abruptly swung to the right, moving over the northbound lane and into the bank on the right-hand side of the road. The steering then loosened considerably and when defendant attempted to move away from the bank by turning the tank sharply to the left, the two vehicles collided. At the time of the collision the left front corner of the tank was approximately a foot and a half into plaintiff's lane. Plaintiff was covered under the Workmen's Compensation Act at the time of the accident.

██ Plaintiff assigns as error the sustaining of the Military Department's demurrer to the original complaint. The basis for the demurrer was ORS 30.265, which provides:

"(1) Subject to the limitations of ORS 30.260 to 30.300, every public body is liable for its torts and those of its officers, employes and agents acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function.

"(2) Every public body is immune from liability for:

"* * * * *

"(b) Any claim for injury to or death of any person covered by the Workmen's Compensation Law.

"* * * * * *"

Plaintiff contends the exception of subsection (2)(b) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the "equal privileges and immunities" guarantee of the Oregon Constitution, Art I, § 20, because it retains immunity as to workmen injured through the negligence of government employes, while abrogating immunity

as to all others injured through the negligence of public employes, thus creating an unreasonable classification.

■ Plaintiff correctly asserts that a statutory classification denies equal protection of the laws if its unequal application to members of the same class has no rational basis in terms of the purpose of the act, or if the statute discriminates without any such rational basis between those to whom it applies and others similarly situated whom it excludes. *Bock v. Bend School Dist. No. 1*, 252 Or 53, 55, 448 P2d 521 (1968). The question for decision, then, is whether the legislature had any rational basis for excepting from the general abrogation of immunity those under the Workmen's Compensation Act. We find no Oregon decisions dealing with a constitutional challenge[2] to Oregon's governmental tort liability act, ORS 30.260-30.300, or any decisions from other jurisdictions with similar statutes.[3]

No citation of authority is necessary to support the proposition that the doctrine of "sovereign immunity" has imposed a hardship upon citizens negligently injured by government employes, forcing them to bear fully the cost of their injuries. Tort liability

---

[2] Recently, this court in Granato/Strader v. City of Portland, 5 Or App 570, 485 P2d 1115 (1971), examined the identical section before us today. The question there was whether the exclusion of subsection (2) (b) of ORS 30.265 applies to a workman, not employed by a government body, injured by the negligence of a government employe; in other words, whether as a matter of statutory construction a workman in plaintiff's position here is excluded. We held it did. However, no constitutional objection was raised there and it was here.

[3] Three states with tort claims acts containing exceptions similar to ORS 30.265(2) are Minnesota, MSA § 466.02; Iowa, ICA § 25A.14; and Hawaii, Hawaii Rev Stat, § 662.15.

acts such as that found in ORS 30.260-30.300, which to a great extent abrogate immunity, provide a means for distributing these losses over a broad group—i.e., the taxpayers.

When an alternate system for distributing the loss already exists, arguably, there is little reason to redistribute the loss by abrogating immunity. *See,* Van Alstyne, Injury, Death, and Taxes: The Decline of Governmental Immunity, 39 State Government 28, 34 (The Council of State Governments 1966) (commenting on the California Government Tort Liability Law); *see generally,* Nellis, *California Governmental Tort Liability and the Collateral Source Rule,* 9 Santa Clara Law 227 (1969).

In his article, *Oregon's Governmental Tort Liability Law from a National Perspective,* 48 OLR 95, 119 (1968), Henke states:

"Although liability insurance is generally available to governments, it has been suggested that governmental immunity be preserved for certain exposures covered by other insurance. The preservation of immunity for claims under the Workmen's Compensation Act is an example of such a policy * * *."

■ ■ Plaintiff argues if existence of a collateral source of compensation is the basis for the exception in question, "why does the exception not provide that any person otherwise insured cannot recover." The short answer to this is that the legislature need not enact laws which operate to solve perfectly every aspect of the problem to which they are directed. *Leech v. Georgia-Pacific Corp.,* 259 Or 161, 167, 485 P2d 1195 (1971). The legislature may have concluded it was best to confine this exception to a

compensation system with which it was familiar—here, one which it had created.⁰ Plaintiff further contends the classification is unreasonable because a workman in some instances would be able to recover more in an action against the government than he would under the Workmen's Compensation Act. That this may be true does not detract from the overall reasonableness of the classification in question.

> " '* * * [A] classification having some reasonable basis does not offend against the Federal Constitution or the Constitution of this state merely because it is not made with mathematical nicety or because in practice it results in some inequality' * * *." *Nilsen v. Davidson Industries, Inc. et al,* 226 Or 164, 169, 360 P2d 307 (1961).

We conclude, therefore, that the classification in question is reasonable and does not offend the equal protection guarantees of the federal or Oregon Constitution.

 The remaining assignments of error relate

---

⁰ A particular aspect of the Workmen's Compensation Law which may distinguish it from other forms of insurance is the employer's statutory right of subrogation in third party claims. A workman injured by a third party not in the employ of the workman's employer may elect to recover damages from the third party in addition to receiving compensation benefits from his employer. ORS 656.578. However, the damages recovered are subject to the lien of the paying agency (the employer or the State Accident Insurance Fund) for any compensation paid under the Act. ORS 656.580(2), 656.593. Thus the legislature might reasonably have concluded that in a third party suit against a public body by a person under the Workmen's Compensation Act, any recovery would primarily inure to the benefit of the employer's compensation carrier. In this regard Henke notes:

"* * * Similarly, prior to the abrogation of governmental immunity, public bodies which followed a practice of paying claims for which a moral obligation was recognized usually would not allow subrogated claims by insurance companies * * *." 48 OLR at 119.

to instructions given in the jury trial which resulted in a judgment in favor of defendant Strawn. On the issue of contributory negligence, plaintiff objected to instruction on the questions of his speed and control, arguing there was insufficient evidence of causation to create a jury question. As a rule, questions of negligence, especially in automobile accident cases, will not be decided as a matter of law. *Hess v. Larson,* 259 Or 282, 286, 486 P2d 533 (1971). The elements of speed, lookout[*] and control are interrelated and usually it is necessary for the jury to consider them together; independent evidence on each is not necessary. *Hess v. Larson,* 259 Or at 289.

In any event, there was evidence on both speed and control. Credible evidence shows plaintiff could have observed the tank's deviations prior to its final entry into plaintiff's lane; yet he maintained a constant speed, estimated between 45 and 60 m.p.h.

That plaintiff did not leave his lane or change direction until just prior to the collision does not necessarily preclude his control being a factor in the accident. Keeping a vehicle under control does not always involve traveling in a straight line. When the situation warrants, a driver must stop, swerve, or otherwise maneuver his vehicle to avoid a collision. *Phillips v. Ocker,* 250 Or 30, 440 P2d 365 (1968). Failure to do so may evidence lack of control. The trial court properly submitted the questions of speed and control to the jury.

■ On the issue of plaintiff's speed, the trial court instructed the jury on the basic speed rule, ORS

---

[*] Plaintiff does not assign as error the court's instructing on his duty as to lookout.

483.102(1) and (2).[9] Plaintiff asserts instruction on subsection (2) enlarged the issue of contributory negligence beyond the scope of the pleadings and evidence. Subsection (2) applies to speed as it affects the control necessary to avoid vehicles "on or entering the highway *in compliance with legal requirements* * * *." (Emphasis supplied.) It was undisputed that defendant's tank entered plaintiff's lane in violation of an operational rule, ORS 483.302. The instruction was proper.

■ ■ Plaintiff's final assignment of error is that the trial court erred in submitting the affirmative defense of sudden emergency to the jury. Plaintiff concedes that violation of an operational statute, such as driving on the wrong side of the highway, may be excused by a sudden, unforeseen emergency. *Pozsgai v. Porter,* 249 Or 84, 87, 435 P2d 818 (1968) ; *Raz v. Mills,* 231 Or 220, 228, 372 P2d 955 (1962). But he argues this defense was not available here because defendant was aware of the steering problem 100 feet before the point of collision but attempted to maneuver the tank into control rather than braking to a halt (which defendant admitted at trial he could have done). The court in *Pozsgai* answered a similar contention, saying:

"* * * Despite defendant's testimony that he

[9] ORS 483.102 at the time of trial read:

"(1) No person shall drive a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections and any other conditions then existing.

"(2) No person shall drive at a speed which is greater than will permit the driver to exercise proper control of the vehicle and to decrease speed or to stop as may be necessary to avoid colliding with any person, vehicle or other conveyance on or entering the highway in compliance with legal requirements and with the duty of drivers and other persons using the highway to exercise due care.

"* * * * *."

could have stopped his vehicle while going five miles per hour, this court is not prepared to say that defendant was negligent as a matter of law in not so stopping if, in fact, he was faced with such an unexpected situation as a jammed steering mechanism. It was a jury question whether under these circumstances, in the exercise of reasonable care, he should have stopped his vehicle before it entered the opposite side of the highway." 249 Or at 88.

Plaintiff does not claim, nor does the evidence show, that prior to the accident defendant knew or had reason to know of the steering problem.

Affirmed.