**Pedro ARROYO and Christopher McCormack, Plaintiffs-Appellants,**

v.

**Peter M. SCHAEFER, former Deputy Warden in Command, Manhattan House of Detention, et al., Defendants-Appellees.**

No. 484, Docket 76–2098.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1976.

Decided Jan. 11, 1977.

**48**

Marjorie M. Smith, New York City (William E. Hellerstein and The Legal Aid Society, New York City, of counsel), for plaintiffs-appellants.

L. Kevin Sheridan, New York City (W. Bernard Richland, Corp. Counsel, New York City, of counsel), for defendants-appellees.

Before MOORE, FEINBERG and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal from an order of the District Court for the Southern District of New York, Knapp, D. J., dismissing a complaint seeking damages for alleged violations of 42 U.S.C. § 1983 after the plaintiffs had presented their case in a trial before a jury.

The plaintiffs-appellants[1] were pretrial detainees in the Manhattan House of Detention for Men (the "Tombs") at the time of the incident alleged. The defendants-appellees are the former Deputy Warden, two Assistant Deputy Wardens, three Captains, two Correction Officers and a prison physician.[2] After plaintiffs filed their complaint *pro se*, the District Court appointed the Legal Aid Society Prisoners' Rights Project to represent them.

I

The basis of plaintiffs' § 1983 claim is an incident in the Tombs in September, 1972. It involved the efforts of prison authorities to return another detainee, Hughes, to his cell. The particulars of the incident were supplied by the testimony of the two appellants.

While the detainees were confined to their cells for a "lock-in" period, Hughes was mistakenly allowed to leave his cell. He was supposed to remain inside his cell throughout the day for punitive reasons. He had been moved from punitive segregation to appellants' section of the prison because he had made trouble for the other prisoners in punitive segregation. Appellant McCormack acknowledged that Hughes was a "trouble-maker," had a reputation "for getting tough" and was in the habit of throwing objects especially broomsticks, at others in the prison.

Hughes refused the order of a correction officer to return to his cell, as he had refused to do in the past. A Captain came and talked to Hughes for five to ten minutes in an effort to persuade him to go back into his cell.

Other officers appeared in the area, some of whom had tear gas dispensers. When the detainees on the floor observed these other guards, Arroyo and McCormack testified that everyone asked to be let out to avoid the gas. Although McCormack testified that the inmates wanted to get out to help the guards put Hughes back into his cell, Arroyo testified that some detainees wanted to get out to help Hughes. In any case, "everyone was talking, making noise, and discussing" and "screaming trying to get out of the cells."

Hughes, in the meantime, "got together a few household utensils that he was going to use in his defense . . . [and] was prepared to make his stand . . . ." A correction officer began to discharge tear gas dust at Hughes. Hughes dodged the dust and the officer in redirecting his aim dispensed a total of three bursts. With the aid of other officers Hughes was subdued.

---

1. There were originally four plaintiffs. The complaint was dismissed as to two of them for failure to prosecute. They have not appealed.

2. Appellants have not appealed from the dismissal of the complaint as to the Commissioner of Corrections and the Warden of the Tombs.

The dispenser was equipped to discharge for a total of ten seconds, in one-second bursts if desired. McCormack testified that each of the three bursts lasted from three to five seconds and described the scene following the discharge of the dust as follows:

". . . we were choking and everyone was trying to get towels, and to, you know, trying to avoid all this discomfort and at the same time there was a lot of confusion. Everybody is panicking. We were asking to be let out ourselves. The officers and everything, they were going about dragging Mr. Hughes out."

After the incident the detainees testified that they had asked to be let out of their cells and removed from the area. Nevertheless, they remained in their cells for 45 minutes up to two hours after the incident. When they were permitted to leave their cells, they were not permitted to leave the immediate area. The shower in appellants' section was broken. Arroyo was told by an officer that they could not go to another section to take a shower because there was only one shower in that section and it was in use.

After the incident, nurses were in the section dispensing medication. Appellants testified that they asked the nurses for medical help, but were not treated for tear gas effects. It was established without contradiction that the nurses themselves wore no protection, such as gas masks. The next shift of guards, however, were said to have worn gas masks. McCormack himself acknowledged that the prison authorities after the incident might have placed fans in the section.

Plaintiffs' expert witness was a doctor who was a member of the Medical Committee for Human Rights and who had treated about two dozen persons in various demonstrations throughout the country. He testified that CN was not really a gas but a dust like talcum powder, and that it can be irritating to the moist membranes of the body, eyes, nose, throat and the lining of the respiratory tract. He gave it as his opinion that people exposed to it should be removed from the area. The experience of tear gas inhaling he said can be very "frightening." The expert did not say that exposure to this type of tear gas was likely to have lasting effects.

## II

The amended complaint charges that "[d]efendants unnecessary and indiscriminate use of tear-gas and their failure to take subsequent measures to reduce or limit the impact of the gas upon plaintiffs deprived plaintiffs of their right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment and of their right to be free from the infliction of harm without due process of law as guaranteed by the Fourteenth Amendment." The District Court, in an oral opinion, after the plaintiffs had presented all their evidence, as we have seen, dismissed the amended complaint as to all defendants.

The test of an Eighth Amendment violation of a prisoner's rights was set forth in *Williams v. Vincent*, 508 F.2d 541 (2d Cir. 1974), as "conduct which 'shocks the conscience.'" There must be present "circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control or dependent upon him." 508 F.2d at 543–44, 546.

Recently the Supreme Court in *Estelle v. Gamble*, —— U.S. ——, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), cited *Williams* in its formulation of a similar standard under the Eighth Amendment in § 1983 actions. There Mr. Justice Marshall stated:

"[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute a "wanton infliction of unnecessary pain" or to be "repugnant to the conscience of mankind." . . .

Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. *In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.*"

— at ——, 97 S.Ct. at 292. (Emphasis added).

While the Eighth Amendment may not, strictly speaking, be applicable to pretrial detainees, as Judge Friendly noted in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973), due process requires no more in this context.[3]

■ Under either constitutional provision, plaintiffs must establish more than a common law tort violation. In *Johnson v. Glick, supra,* which also involved pretrial detainees, this court applied the *Rochin* test and discussed the nature of the detainees' constitutional protection:

"Certainly the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action . . . .. The management by a few guards of large numbers of prisoners, not usually the most gentle or tractable of men and women, may require and justify the occasional use of a degree of intentional force. Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." 481 F.2d at 1033.

### III

■ The almost reflex action of prison guards in dealing with prisoners or detainees in emergencies cannot be equated with patterns of misconduct that are deliberate matters of policy. The prison authorities here were suddenly confronted with an obstreperous inmate to whose aid others might come if released from their cells. The avoidance of a riot that might be difficult to quell is surely a *desideratum* of a reasonable prison administration. To be sure, emergency does not excuse irresponsibility. Thus if bullets had been fired in a fashion so indiscriminate as to inflict bodily harm on innocent inmates, the civil rights issue would be different. Here the tear gas of the lowest order of danger, CN, so often used to dissipate riots, is hardly the stuff of which serious injury is made. Considering that there was no calculated harm, the emergency condition insulates the prison officials against an accusation of callous disregard such as would support a claim of deprivation of constitutional right. Permitting the nurses to appear without protective gas masks accents the point.

Judge Knapp could properly conclude on the basis of the plaintiffs' case that the testimony was contrived. The effect of the tear gas was not very strong. McCormack conceded that he felt no burning sensation on his skin. Though McCormack complained of vomiting, the plaintiffs' own expert conceded on the basis of McCormack's testimony that the gas level was "quite low" and would not cause the vomiting of which McCormack complained. Though McCormack testified that he had a nosebleed as well, the same expert testified that tear gas never causes nosebleeds.

When Arroyo visited Bellevue Hospital a few days later, he did not complain of burns, nor did the doctors notice any. Though Arroyo testified that the "dust" hit him directly in the face (even though it was emitted by something like an "oversized can of hair spray" highly localized in effect), he,

---

3. In formulating the Eighth Amendment standard in *Estelle, supra*, Mr. Justice Marshall used the test of conduct "repugnant to the conscience of mankind" which he specifically noted was the due process test used in *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 471, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring) and *Palko v. Connecticut*, 302 U.S. 319, 323, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (Cardozo, J.). —— U.S. at ——, 97 S.Ct. at 292. And this court in *Williams v. Vincent, supra*, used the due process test of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), "conduct that shocks the conscience." 508 F.2d at 543–44.

nevertheless, continued to watch the scene instead of moving back to avoid the gas.

The nurses who allegedly refused medical attention to the plaintiffs wore no masks themselves, as we have seen, and none of the nurses was identified or made a defendant. Nor was there any evidence that the nurses, if request was indeed made to them for medical treatment, ever reported the request to any of the defendants.

Finally, the plaintiffs failed to establish a callous or shocking disregard of their well-being by any of the particular named individual defendants. *Respondeat superior* is not a doctrine that is applicable to § 1983 actions. *Williams v. Vincent, supra; Johnson v. Glick, supra.* In this case, there was no evidence that any of the defendants was informed that the inmates requested medical treatment or that medical treatment was necessary. The initial use of tear gas of this low quality was, as we have seen, justified by the nature of the emergency. Since Judge Knapp saw clearly that allowing a verdict for the plaintiffs would amount to a miscarriage of justice, he quite properly dismissed the complaint on the plaintiffs' case for not amounting to a minimum constitutional violation.

Affirmed.