Gerald ALBERS, Plaintiff,

v.

Harol WHITLEY, et al., Defendants.

Civ. A. No. 81–517–PA.

United States District Court,
D. Oregon.

Aug. 31, 1982.

Gene B. Mechanic, Alice Goldstein, Portland, Or., for plaintiff.

Dave Frohnmayer, Atty. Gen., Scott McAlister, Asst. Atty. Gen., Salem, Or., for defendant.

## OPINION

PANNER, District Judge.

This is a civil rights action against individual corrections officers arising out of a disturbance in "A" Block of the Oregon State Penitentiary on June 27, 1980. Plaintiff was injured by shotgun fire. He alleged that he was deprived of rights under the eighth and fourteenth amendments. Additionally, he appended state tort claims for assault and battery and negligence.

At the conclusion of a jury trial, I directed a verdict for the defendants. I ruled that there was not sufficient evidence presented from which a jury could conclude that plaintiff was deprived of any constitutional rights. Alternatively, I ruled that the defendants were immune from damages. I rejected plaintiff's pendent claims. Entry of judgment has been withheld pending this opinion.

## STANDARDS FOR DIRECTED VERDICT

A directed verdict is appropriate if the evidence permits only one reasonable conclusion as to the verdict. *California Computer Products v. I.B.M.*, 613 F.2d 727, 732–33 (9th Cir. 1979). To reach such a conclusion, I must consider all the evidence but must do so in a light most favorable to the nonmovant. *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 909 (9th Cir.), *cert. denied*, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978). I cannot weigh the evidence presented nor consider the credibility of witnesses. All reasonable inferences must be drawn in favor of the nonmovant. *Fountila v. Carter*, 571 F.2d 487, 490 (9th Cir. 1978); *Kay v. Cessna Aircraft Co.*, 548 F.2d 1370, 1372 (9th Cir. 1977). Finally, I note this circuit's admonition that a motion for directed verdict should be granted only "where there is no substantial (or 'believable') evidence to support" any other verdict. *Autohaus Brugger, supra* at 910.

## FACTS

Plaintiff Gerald Albers was an inmate housed in cellblock "A" at the Oregon State Penitentiary in Salem, Oregon on June 27, 1980. Defendant Whitley was security manager of the penitentiary; defendant Cupp was superintendent; defendant Keeney was an assistant superintendent; and defendant Kennecott was a corrections officer.

Cellblock "A" is an "honor" cell consisting of two tiers and housing for over 200 inmates. Lower tier cells are adjacent to an open area. A stairway leads to the upper tier. A hallway off the open area leads out of the cellblock. The lower tier cells are separated from the open area by floor-to-ceiling bars and a barred door. On each tier are two opposing rows of cells. Open floor separates the lower tier rows of cells. Open space separates the rows on the upper tier. While it is possible to jump and climb between tiers, the stairway offers the only practicable way for inmates to reach the upper tier. Prison officers may enter cellblock "A" from either end, on either tier and can control entry into either tier by means of barred walkways.

Inmates housed in cellblock "A" have good disciplinary records and accordingly, enjoy certain privileges that are denied the rest of the prison population. Significantly, cellblock "A" inmates are allowed more time outside their cells. Normal "cell-in" time for cellblock "A" is 11:00 p.m. on weekdays and midnight on weekends.

On Friday night, June 27, 1980, several cellblock "A" inmates became upset over perceived mistreatment of other inmates who were being escorted by guards to the prison's segregation and isolation building. Some inmates verbally expressed their agitation believing there was unnecessary force used by the guards in escorting the prisoners.

Corrections officers Fitts and Kemper were on duty in cellblock "A" on June 27, 1980. At approximately 9:15 p.m., Officer Kemper received a call. He was instructed to order all inmates in cellblock "A" to return to their cells. This cell-in order was apparently due to the commotion and tense mood of the inmates. Accordingly, Kemper issued the order for all inmates to return to their cells. At that time, he was standing in the open area adjacent to the lower tier. Fitts was nearby. Plaintiff was in his upper tier cell # 274.

The cell-in order was met with resistance. Several inmates demanded to know the reason for the order. One inmate, Richard Klenk, became particularly upset. Klenk jumped from the second tier and confronted and assaulted Kemper. Kemper left the cellblock but Fitts remained. Shortly after Kemper left, Klenk and other inmates began to break furniture. Two inmates escorted Fitts from the open area into an office, stating that Fitts would be protected from harm there.

Kemper informed the control center of the disturbance in cellblock "A". Defendants Cupp and Keeny were immediately notified and both proceeded to the penitentiary. Defendant Whitley was also advised of the disturbance and went to cellblock "A".

Whitley entered cellblock "A", climbing over broken furniture placed by inmates in the hallway leading into the cellblock. Whitley spoke with inmate Klenk. Whitley agreed to allow four inmates to be escorted to the segregation and isolation building to observe the condition of the inmates who were taken there earlier. Whitley left cellblock "A" with those four inmates. The four later reported back to fellow inmates in cellblock "A" that the prisoners in segregation and isolation were not harmed but were intoxicated. This information did not quell the disturbance.

Whitley returned to the cellblock and asked Klenk to allow him to see Officer Fitts. Klenk brought Fitts to Whitley who observed that Fitts was not harmed. Fitts was returned to the office but shortly thereafter was taken to cell # 201 on the upper tier.

Meanwhile, Whitley left the cellblock and began organizing an assault squad. At some point, Whitley and others were aware that Klenk had secured a homemade knife. Klenk had also informed Whitley that one inmate had been killed and that others would die.

Whitley returned to the cellblock for a third time. Klenk repeated his earlier demand to meet with media representatives. Whitley again requested to see Fitts. Klenk escorted Whitley to cell # 201. Fitts reported that he was unharmed. Sev-

eral inmates in and around cell # 201 stated to Whitley that they would protect Fitts from physical harm. Whitley left the cellblock, noting that a barricade had been constructed that limited access into the cellblock.

Whitley advised defendants Keeney and Cupp of the events and his assessment of the situation. It was agreed that tear gas could not be utilized. Cupp thereupon ordered Whitley to take a squad into "A" block armed with shotguns. Cupp ordered that the squad be instructed to "shoot low."

During these events, plaintiff left his cell on the second tier. While this was in violation of the "cell-in" order, there was evidence that plaintiff was requested by other inmates to leave his cell and aid in quelling the disturbance. Plaintiff proceeded down the stairs from the upper tier to the open area in front of the lower tier cells. Although a disputed fact, I accept for purposes of analyzing the evidence, that the steel-barred door which provides access from the lower tier to the open area was closed and locked. I also accept as true, plaintiff's statement that he spoke with Whitley shortly after Whitley spoke with Fitts in cell # 201. Plaintiff asked Whitley whether the locked door on the lower tier could be opened to allow inmates, including several elderly inmates, to leave that area until the commotion died down. Whitley responded that he would find out and return with the key.

By this point, the assault group had assembled outside the barricaded entry way. Shotguns had been assigned to Kennecott and Officers Jackson and Smith. Acting under Cupp's orders, the guns were loaded with # 6 shot. A second group of officers, without firearms, were assigned to immediately follow the assault group across the barricade. Whitley instructed Kennecott to follow him across the barricade and to fire a warning shot on entry and to shoot low at anyone heading up the stairs toward cell # 201. At about 10:30 p.m., Whitley entered the cellblock, unarmed, followed by Kennecott, Jackson and Smith, all armed with shotguns.

Plaintiff was waiting at the bottom of the stairway for Whitley to return with the key. When Whitley did return, plaintiff asked about the key. The events that followed are in dispute. Viewed in a light most favorable to plaintiff, there was evidence that Whitley screamed "shoot these bastards" and began running toward the stairs in pursuit of inmate Klenk, without ordering plaintiff to return to his cell. While some lights were broken, there was evidence that the area was sufficiently lighted to enable plaintiff to be recognized and distinguished from other inmates.

Kennecott followed Whitley over the barricade and discharged a warning shot into the wall opposite the cellblock entrance. Once over the barricade, Kennecott discharged a second shot which struck a post near the stairway.

Meanwhile, Whitley had chased Klenk up the stairs toward cell # 201. At the doorway to cell # 201, Whitley caught and, with the aid of several inmates, subdued Klenk. Concurrently, plaintiff began running up the stairs behind Whitley. Kennecott fired a third shot which struck plaintiff in his knee. After being shot, plaintiff crawled up the stairs and sought shelter in a mop room at the top of the stairs.

After Officer Fitts was released unharmed, corrections personnel began to care for the wounded inmates. In addition to plaintiff, another inmate was injured by gunshot on the stairs. Other inmates on the lower tier were also struck by gunshot.

Plaintiff does not claim that his medical care was inadequate. It is, therefore, not detailed. Plaintiff sustained severe nerve damage to his lower left leg, with residual paralysis, and mental and emotional distress.

## ISSUES

1. Was there evidence from which a jury could conclude that plaintiff was deprived of any rights, privileges, or immunities secured by the Constitution?

2. Alternatively, are defendants immune from money damages? and

3. Was there evidence from which a jury could conclude that defendants are liable for assault and battery and negligence under state law?

## DISCUSSION

### I. CONSTITUTIONAL RIGHTS.

█ Lawful imprisonment necessarily limits individual rights and privileges. *Price v. Johnson,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). By the very nature of confinement, a prisoner is deprived of certain liberties. Nevertheless, convicts do not forfeit all constitutional protections. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).

█ Section 1983 provides a civil remedy for alleged constitutional deprivations. To establish a prima facie case, plaintiff need only prove that the conduct was committed by a person acting under color of state law, and that the conduct in question deprived plaintiff of rights secured by the Constitution. It is not necessary to allege or prove the defendants' state of mind. *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

All defendants were acting under color of state law. Plaintiff's proof was therefore limited to the issue of whether defendants' conduct deprived him of any rights secured by the Constitution.

█ Based upon the events of the night of June 27, 1980, plaintiff argues that defendants violated his constitutional rights guaranteed by the eighth and fourteenth amendments.[1] Underlying that claim is plaintiff's theory that defendants used unreasonable, excessive force under the circumstances. While plaintiff does not question defendants' responsibilities to quell inmate disturbances and to rescue hostages, plaintiff argues that action short of deadly force should have been used. Plaintiff argues, therefore, that defendants' use of deadly force deprived him of rights secured by the Constitution.

█ The unjustified striking, beating, or infliction of bodily harm upon a prisoner gives rise to liability under § 1983. *King v. Blankenship,* 636 F.2d 70, 72 (4th Cir. 1980). The eighth amendment, applicable to the states through the fourteenth amendment, prohibits the infliction of cruel and unusual punishment. *Robinson v. State of California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Intent to punish a prisoner is not a necessary component of an eighth amendment claim under § 1983. *Spain v. Procunier,* 600 F.2d 189, 197 (9th Cir. 1979); *Haygood v. Younger,* 527

---

1. I do not understand plaintiff to assert an independent violation of fourteenth amendment due process. To prevail on such a theory, plaintiff must prove that he was divested of a protected interest without due process of law. While plaintiff undoubtedly had liberty and life interest at stake, it is unclear what process was due him. "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The right to be free from infliction of harm without due process as guaranteed by the fourteenth amendment usually applies to pretrial detainees. *E.g., Arroyo v. Schaefer,* 548 F.2d 47, 49–50 (2d Cir. 1977). In limited instances, a regulation or statute may create a due process interest enforceable by a prisoner. *E.g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442

U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Here, no regulation or statute was cited which would give plaintiff an expectation of a due process hearing prior to the alleged deprivation of liberty. *See Hayward v. Procunier,* 629 F.2d 599, 601 (9th Cir. 1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981). Furthermore, in the midst of the emergency created by riotous inmates holding a guard hostage, the Constitution simply does not mandate a due process hearing for each inmate potentially affected by remedial action. *Hayward, supra* at 602–03 (no due process right to hearing prior to lockdown of prison). When prison authorities are reacting to emergency situations in an effort to preserve the safety and integrity of the institution, the state's interest in decisive action clearly outweighs the inmates' interest in a prior procedural safeguard. *La Batt v. Twomey,* 513 F.2d 641, 645 (7th Cir. 1975).

F.Supp. 808, 820 (E.D. Cal. 1981). What is required in a § 1983 action based on the eighth amendment is that the defendants caused harm upon the plaintiff that was cruel and unusual.

While the use of excessive force may give rise to liability under § 1983, the statute cannot be interpreted to impose liability for breach of duties of care arising out of tort law. *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). "[N]ot every instance of the use of excessive force gives rise to a cause of action under § 1983 merely because it gives rise to a cause of action under state tort law or is prosecutable under criminal assault and battery law." *King v. Blankenship, supra,* 636 F.2d at 73. To be actionable under § 1983, the alleged excessive use of force must rise to "constitutional dimensions." *Pritchard v. Perry,* 508 F.2d 423, 426 (4th Cir. 1975). *See also Johnson v. Glick,* 481 F.2d 1028, 1033–34 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Miller v. Hawver,* 474 F.Supp. 441 (D. Colo. 1979). As Judge Friendly observed in *Johnson v. Glick, supra,* 481 F.2d at 1033, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."

In determining whether this constitutional line has been crossed in this case, I must examine such factors as the need for application of force, the relationship between the need and amount of force that was used, and the extent of the injury inflicted. *Johnson v. Glick, supra,* 481 F.2d at 1033. In applying these factors, I bear in mind that the defendants here are not charged with a pattern of practice or conditions usually associated with eighth amendment violation. Here, the cause of action arose from a single, isolated incident, not likely to be repeated. Under those circumstances, courts have shown a general reluctance to judge the actions of jailers in hindsight. *E.g., La Batt v. Twomey,* 513 F.2d 641, 647 (7th Cir. 1975) (institutional lockdown); *Miller v. Hawver,* 474 F.Supp. 441, 442–43 (D. Colo. 1979) (physical attack by guards); *Arroyo v. Schaefer,* 548 F.2d 47, 50 (2d Cir. 1977) (tear gas injury); *see also Cattan v. City of New York,* 523 F.Supp. 598, 600–01 (S.D.N.Y. 1981) (excessive force by police officers). Nevertheless, emergency conditions do not excuse irresponsibility. The infliction of harm to a prisoner may be cruel and unusual even when applied in pursuit of legitimate objectives, if it goes beyond what is necessary to achieve those objectives. *Ridley v. Leavitt,* 631 F.2d 358, 360 (4th Cir. 1980); *Suits v. Lynch,* 437 F.Supp. 38, 40 (D.Kan.1977).

Here, the uncontradicted evidence is that defendants were faced with a riot situation. At least one inmate was armed with a knife. Others were armed with pieces of furniture. One inmate was reported dead and others were said by Klenk to be in danger. Inmates had destroyed much of the cellblock furniture and had constructed a barricade. One guard was held hostage and although there is evidence to show that for the most part he was in the hands of sympathetic inmates, there was uncontradicted evidence that the armed inmate threatened to kill the hostage. In response to this situation, defendants utilized deadly force and inflicted upon plaintiff a serious injury.

Prison officials must be free to deal firmly with outbreaks and uncontrolled situations. They must maintain order, discipline and preserve the security of inmates and guards. *Suits v. Lynch, supra,* 437 F.Supp. at 40. Jailers are not obliged to await large-scale violence or repeated assaults on inmates or guards before taking action. Indeed, prison officials would be derelict if, after receiving warning of violent action, they waited fulfillment of the threat before responding. *Olgin v. Darnell,* 664 F.2d 107, 109 (5th Cir. 1981). In the setting of a prison emergency such as an inmate riot, where certain remedial measures are necessary, prison officials must, within their discretion, curtail certain rights of prisoners. *Blair v. Finkbeiner,* 402 F.Supp. 1092, 1094–95 (N.D. Ill. 1975). Of course, while prison officers are to be afforded broad discretion in maintaining or-

der within the prison walls, the discretion is not unlimited. Only reasonable force under the circumstances may lawfully be employed. *Ridley v. Leavitt,* 631 F.2d 358, 360 (4th Cir. 1980); *Martinez v. Rosado,* 614 F.2d 829 (2d Cir. 1980).

Defendants reasonably exhausted attempts to quell the riot through nonforceful means. Three times defendant Whitley entered the cellblock to attempt to calm inmates, disarm inmate Klenk, and to restore order. While there is evidence, viewed in a light most favored to plaintiff, that the general disturbance was subsiding, Whitley's attempt at nonforceful resolution failed. The hostage remained. Klenk had also claimed to have killed one inmate and threatened others. Under these circumstances, I hold that the use of force to quell the riot, rescue the threatened hostage, and restore order to cellblock "A" was reasonable, necessary and proper. No reasonable jury would have concluded otherwise. An issue remains, however, whether the use of deadly force was reasonably proportional to the need for force.

My research disclosed no reported decisions in which an inmate, shot by guards during the quelling of a prison riot, sought damages for alleged violations of constitutional rights. While such shootings have occurred, *e.g., Inmates of Attica v. Rockefeller,* 453 F.2d 12, 15 (2d Cir. 1971), apparently no civil suits were filed.

In *LeBlanc v. Foti,* 487 F.Supp. 272, 275–76 (E.D. La. 1980), the court assumed for purposes of analysis that plaintiff was maced by prison guards when a disturbance broke out among inmates. The court held that the use of mace by prison guards to quell the disturbance was not unreasonable force under the circumstances. *Accord, Clemmons v. Greggs,* 509 F.2d 1338, 1340 (5th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 360, 46 L.Ed.2d 280 (1975) (use of tear gas to prevent escape held to be reasonable); *Davis v. United States,* 439 F.2d 1118, 1119–20 (8th Cir. 1971) (use of tear gas to quell riot was reasonable).

Here, a decision was made by the defendants not to use tear gas or mace. There was concern whether prison officials could maneuver through the barricade and administer the gas quickly enough to assure that no harm came to the hostage. There was also concern whether gas would have the necessary effect in the relatively large area of cellblock "A". Gas would cause great discomfort to the majority of inmates who had obeyed the cell-in order and were in their cells. These concerns were reinforced by expert testimony by both sides at trial.

The decision to use deadly force was made after failure of nonforceful settlement and after rejection by officials of the use of gas. The shotguns were loaded with # 6 shot which consists of quite small pellets. Instructions were given to shoot low anyone who followed Whitley up the stairs toward cell # 201.

Viewing the evidence in favor of plaintiff, the prison officials knew that inmates who had disobeyed the cell-in order might be injured by the shooting. Nevertheless, interests of prisoners must be balanced against those of the prison institution. *Blair v. Finkbeiner, supra,* 402 F.Supp. at 1095. Where prison authorities react to emergency situations and determine that immediate action is necessary to forestall a riot, that determination outweighs the interest of accurately assessing individual culpability before taking precautionary steps. *La Batt v. Twomey, supra,* 513 F.2d at 645.

Defendants here were faced with a situation that had extreme potential danger to a hostage guard and to inmates. Possible alternatives to force were reasonably considered and rejected. While plaintiff's experts suggested possible riot formations, tear gas, and sharpshooter alternatives, it would be speculative to conclude that such other alternatives would have been more effective in securing the release of the hostage and the safety of the inmates. The safety of the hostage and the nonrioting inmates was of paramount importance to the defendants.

Prison officers' choice of alternatives available to them in emergency situations must not be unduly hindered by overbroad

judicial scrutiny, especially on the basis of hindsight. *La Batt v. Twomey, supra,* 513 F.2d at 647. Although factually distinguishable, *La Batt* is highly instructive on the proper degree of judicial review of prison officials' decision-making during emergency situations:

'We recognize that present or impending disturbances which might overtax the control capacity of a prison creates a dominant interest in prison authorities being able to act without delay if they feel that delay would endanger the inmate, others, or the prison community. [Citations omitted.] This is so even though the assessment of difficulties may subsequently prove to be unfounded . . .' [Citations omitted.] The psychology and social stability of a prison community are foreign to one who is not involved with it on a day-to-day basis. Any attempt to reconstruct, at a later date, the conditions present at the time of dispute, and the dangers then feared by prison authorities, is fraught with perils of misunderstanding and misapprehension.

Accordingly, the standard of review of a challenge to the sufficiency of the basis of emergency response must be generous to the administration. We conclude that, absent a claim of bad faith or mere pretext on the part of prison authorities in the imposition of emergency procedures, the underlying bases of decision must be deemed to lie fully within their expertise and discretion and, accordingly, is insulated from subsequent judicial review.

*La Batt, supra,* 513 F.2d at 647.

Viewing the evidence in a light most favorable to the plaintiff, I hold that defendants' use of deadly force was justified under the unique circumstances of this case. Possible alternatives were considered and reasonably rejected by prison officers. The use of shotguns and specifically the order to shoot low anyone following the unarmed Whitley up the stairs were necessary to protect Whitley, secure the safe release of the hostage and to restore order and discipline. Even in hindsight, it cannot be said that defendants' actions were not reasonably necessary.

Accordingly, applying the factors enumerated in *Johnson v. Glick, supra,* 481 F.2d at 1033, I hold that under the circumstances of this case, plaintiff's claims of excessive force do not rise to that "constitutional dimension" sufficient to support a cause of action under § 1983.

## II. QUALIFIED IMMUNITY.

■ Prison officials enjoy a qualified immunity from damages in § 1983 actions. *Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978). Defendants bear the burden of pleading and proving their entitlement to qualified immunity. *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (pleading); *Harris v. City of Roseburg,* 664 F.2d 1121, 1129 (9th Cir. 1981) (proving). Such immunity is necessary to insulate public officers from vexatious litigation and to allow public officers to take prompt action based on information provided to them by third parties. *Scheuer v. Rhodes,* 416 U.S. 232, 246, 94 S.Ct. 1683, 1691, 40 L.Ed.2d 90 (1974) (state governors); *Wood v. Strickland,* 420 U.S. 308, 319, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975) (school board members). These factors become particularly relevant for prison officers who must exercise an exceedingly broad range of discretion in performing official duties. *Douthit v. Jones,* 619 F.2d 527, 534 (5th Cir. 1980) (dictum).

There is often confusion between a plaintiff's prima facie case and defendants' affirmative defense of qualified immunity. This is because the evidence the plaintiff is required to produce to establish a prima facie case is precisely the type of evidence that makes the defendants' immunity less likely. *Gullatte v. Potts,* 654 F.2d 1007, 1014–15 (5th Cir. 1981). It is not unusual for courts to "skip" over the constitutional claims and consider the immunity issue since a finding of qualified immunity moots the effect of the constitutional violation. *E.g., Procunier v. Navarette, supra; Baker v. Norman,* 651 F.2d 1107, 1124 (5th Cir. 1981). While I hold that defendants did not

deprive plaintiff of any constitutional rights, I find it appropriate to analyze defendants' affirmative defense of qualified immunity. I hold as an alternative grounds in support of the directed verdict that defendants are immune from damages.

 Under the qualified immunity doctrine, a public officer performing acts in the course of official conduct is insulated from damage suits if (1) at the time and in light of all circumstances there existed reasonable grounds for the belief that the action was appropriate; and (2) the officer acted in good faith. *Harris v. City of Roseburg, supra,* 664 F.2d at 1128. Courts have determined that this two-prong analysis calls for both an objective and subjective evaluation of official conduct. *E.g., Williams v. Treen,* 671 F.2d 892, 896 (5th Cir. 1982); *Gullatte v. Potts, supra,* 654 F.2d at 1012–14; *Harris v. City of Roseburg, supra,* 664 F.2d at 1127–28; *Lock v. Jenkins,* 641 F.2d 488, 499–500 (7th Cir. 1981). *See also Wood v. Strickland, supra,* 420 U.S. at 321–22, 95 S.Ct. at 1000–01; *Procunier v. Navarette, supra,* 434 U.S. at 562–66, 94 S.Ct. at 859–62. Under the subjective test, an official forfeits his immunity when he acts with malicious intent to cause a deprivation of constitutional rights. *Williams v. Treen, supra,* 671 F.2d at 896. An official must prove that "he was acting sincerely and with the belief that he was doing right, not knowing that his official action would violate [plaintiff's] constitutional rights . . . ." *Harris v. City of Roseburg, supra,* 664 F.2d at 1128. Under the objective standard an official, even if acting in the sincere subjective belief that actions taken are right, loses the cloak of qualified immunity if the actions taken contravene settled, indisputable law. *Williams v. Treen, supra,* 671 F.2d at 896. Defendants must show that they should not have reasonably known that their official action would violate plaintiff's constitutional rights. *Harris v. City of Roseburg, supra,* 664 F.2d at 1128.

The Supreme Court recently re-examined the qualified or "good faith" immunity defense. In *Harlow & Butterfield v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court reviewed the traditional "objective" and "subjective" standards and greatly limited the use of the subjective analysis. Relying on its past decisions in *Procunier v. Navarette, supra,* 434 U.S. at 565, 94 S.Ct. at 861 and *Wood v. Strickland, supra,* 420 U.S. at 321, 95 S.Ct. at 1000, the Court held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow, supra,* 102 S.Ct. at 2738. The Court concluded that judicial inquiry into subjective motivation was particularly disruptive of effective government and prevented the pretrial resolution of many insubstantial claims. *Id.*

The Court thus defined the limits of qualified immunity essentially in objective terms, concluding that such a limitation would adequately safeguard individual statutory and constitutional rights. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action 'taken with independence and without fear of consequences.' *Pierson v. Ray,* 386 U.S. 547, 554 [87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288] (1967)" (footnote omitted). *Harlow, supra,* 102 S.Ct. at 2739.

 Applying these standards to the facts of this case, I hold that defendants are immune from damages. Defendants are liable only if they actually knew or should have known that their action violated plaintiff's constitutional rights. *Harlow, supra,* 102 S.Ct. at 2739; *Sequin v. Eide,* 645 F.2d 804, 812 (9th Cir. 1981). Only a reasonable belief is necessary since officials cannot be expected to predict the course of constitutional law upon which federal judges often differ. *Smiddy v. Varney,* 665 F.2d 261, 266 (9th Cir. 1981), citing *Bivens v. Six Un-*

*known Named Agents of the Federal Bureau of Narcotics,* 456 F.2d 1339, 1349 (2d Cir. 1972) (Lumbard, J., concurring).

■■■ The issue of qualified immunity is generally a question for the jury. *Beard v. Udall,* 648 F.2d 1264, 1272 (9th Cir. 1981). Nevertheless, if the evidence permits only one reasonable conclusion, a directed verdict is appropriate. Here, there was no clearly established constitutional right to be free from the use of deadly force administered for the necessary purpose of quelling a prison riot and rescuing a hostage. While injuries had undoubtedly occurred under similar circumstances no reported cases established the right of a prisoner to recover damages for the alleged constitutional violation. In contrast, case authority at the time of this incident clearly provided great discretion to prison officials to take necessary action to maintain and control prison situations.[2]

I hold that defendants could not have reasonably known that actions taken to quell the disturbance and rescue the hostage would violate any prisoner's constitutional rights. Therefore, applying the objective test mandated by *Harlow, supra,* I hold that defendants are entitled to a qualified immunity from damages. No reasonable jury would conclude otherwise.

## III. PENDENT CLAIMS.

### A. *Jurisdiction.*

■■■ Federal courts may exercise jurisdiction over pendent state claims that arise from "a common nucleus of operative facts." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). When federal claims are dismissed prior to trial, pendent state claims with few exceptions must also fail. *Gibbs, supra* at 726, 86 S.Ct. at 1139; *Wren v.*

*Sletten Construction Co.,* 654 F.2d 529, 536 (9th Cir. 1981). Nonetheless, it is not necessary to have continual jurisdiction over federal claims as a prerequisite to resolution of pendent claims. *Meyer v. California and Hawaiian Sugar Co.,* 662 F.2d 637, 640 (9th Cir. 1981). Where there has been a trial of the operative facts underlying both federal and state claims, a "decent regard for economical and sensible use of the state and federal judicial machinery and considerations of expense to the litigants" requires a court to decide the pendent claims even though the federal ones fail. *McLearn v. Cowen & Co.,* 660 F.2d 845, 848 (2d Cir. .1981) (dictum). Once a trial is held, dismissal of the pendent claims should be made only if the federal cause of action was so insubstantial and devoid of merit that there is obviously no federal jurisdiction. *Traver v. Meshriy,* 627 F.2d 934, 939 (9th Cir. 1980).

■■■ I hold that the federal claims in this case were not frivolous nor insubstantial. While the federal claims ultimately were not meritorious, they were sufficient to confer jurisdiction. Accordingly, I exercise my discretion to reach the merits of the pendent state claims. *Rosado v. Wyman,* 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970).

### B. *Merits.*

■■■ Plaintiff asserted two pendent state claims. First, plaintiff alleged that defendants were negligent. To state a cause of action in negligence under Oregon law, plaintiff must allege that defendants owed a duty, that defendant breached that duty, and that the breach was the cause in fact of some legally cognizable damage to plaintiff. *Brennan v. City of Eugene,* 285 Or. 401, 405, 591 P.2d 719, 722 (1979). Second, plaintiff alleged that defendants

---

2. *E.g., Arroyo v. Schaefer,* 548 F.2d 47 (2d Cir. 1977); *La Batt v. Twomey,* 513 F.2d 641 (7th Cir. 1975); *Clemmons v. Greggs,* 509 F.2d 1338 (5th Cir.), *cert. denied,* 423 U.S. 946, 96 S.Ct. 360, 46 L.Ed.2d 280 (1975); *Pritchard v. Perry,* 508 F.2d 423 (4th Cir. 1975); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Da-* *vis v. United States,* 439 F.2d 1118 (8th Cir. 1971); *LaBlanc v. Foti,* 487 F.Supp. 272 (E.D. La. 1980); *Miller v. Hawver,* 474 F.Supp. 441 (D. Colo. 1979); *Suits v. Lynch,* 437 F.Supp. 38 (D. Kan. 1977); *Blair v. Finkbeiner,* 402 F.Supp. 1092 (N.D. Ill. 1975). *See generally,* discussion in Section I, *supra.*

committed an assault and battery. Under Oregon law, assault is an intentional attempt to do violence to another person. *Cook v. Kinzua Pine Mills Company,* 207 Or. 34, 47, 293 P.2d 717, 723 (1956). Battery is the voluntary act which causes intentionally harmful or offensive contact with another. *Baker v. Baza'r, Inc.,* 275 Or. 245, 249, 551 P.2d 1269, 1271 (1969).

■ Even assuming that plaintiff can prove the necessary elements to recovery for these alleged tort claims, I hold that recovery is barred by the Oregon Tort Claims Act. Or. Rev. Stat. § 30.265(3)(e) provides that every public body and its officers acting within the scope of their employment are immune from liability for any claim arising out of riots, civil commotion or mob actions. The immunity further extends to any act or omission in connection with the prevention of riots.

Plaintiff argues that the statute provides only government immunity and not employee immunity. Plaintiff contends that Or. Rev. Stat. § 30.265 applies only to the financial liability of the state for actions taken by its public bodies and by their employees as officials within the scope of their employment. Thus, immunity would not extend to employees who are sued as individuals based on personal, tortious conduct.

Or. Rev. Stat. § 30.265(3) does not bar suit against state officers who commit torts while acting outside the scope of their employment or duties. *Dickens v. DeBolt,* 288 Or. 3, 10–12, 602 P.2d 246, 250–51 (1979) (police officer not immune for acts taken outside scope of employment). Nonetheless, that exception does not apply here. Plaintiff specifically alleges that defendants acted by virtue of their vested authority and in their official capacities. There was no evidence to the contrary.

Plaintiff argues that no recovery is sought against the public body. Under the Oregon Tort Claims Act, the public body is liable for the torts of its employees acting within the scope of their employment. Or. Rev. Stat. § 30.265(1). The public body has an obligation to defend its employees in such civil actions and, if necessary, to indemnify them. *Id.* Here, the state legislature chose not to waive immunity for officers acting within the scope of their employment for claims arising out of a riot.

■ Plaintiff's remaining arguments against the application of immunity are considered and rejected.[3] Accordingly,

---

**3.** Plaintiff argues that the affirmative defense of immunity was not properly raised. I find, however, that the Answer alleges as a "Third Affirmative Answer and Defense" that defendants are immune from liability as a matter of law. Plaintiff also argues that application of Or. Rev. Stat. § 30.265(3)(e) to bar employee liability violates the due process provision of the Oregon Constitution. Oregon Constitution, Art. I, Section 10. That section provides that "... every man shall have remedy by due course of law for injury done to him and his person, property or reputation."

Article I, Section 10 of the Oregon Constitution was historically directed against denying a remedy for a legal injury to private interest recognized under the common law of torts or property. *American Can Co. v. Oregon Liquor Control Commission,* 15 Or.App. 618, 647, 517 P.2d 691, 705 (1973). Here, plaintiff argues that barring recovery from public employees for actions which, if performed by private individuals might very well be actionable, is a denial of due process under the Oregon Constitution.

The disparate treatment between private and public tortfeasors provided by the Oregon Tort Claims Act has been the subject of prior constitutional challenge. *E.g., Webb v. Highway Div., et al.,* 56 Or.App. 323, 328, 641 P.2d 1158, 1161 (1982) (equal protection and due process challenge to disparate notice requirements rejected); *Riddle v. Cain,* 54 Or.App. 474, 478–79, 635 P.2d 394, 396, *pet. for review denied,* 292 Or. 334, 644 P.2d 1127 (Or. 1981) (due process challenge to notice requirement rejected); *Brown v. Portland School District # 1,* 48 Or.App. 571, 576, 617 P.2d 665, 668 (1980), *rev. on other grounds,* 291 Or. 77, 628 P.2d 1183 (1981) (equal protection challenge to notice requirement rejected); and *Edwards v. State, Military Department,* 8 Or.App. 620, 623–25, 494 P.2d 891, 893–94 (1972) (equal protection challenge to immunity for liability of tort claims covered by Workmen's Compensation Law rejected).

Here, although the constitutional challenge differs from the above cases, it must nevertheless be rejected. The purpose of Article I, Section 10 due process provision is "to save from legislative abolishment those jural rights which had become well established prior to the enactment of our Constitution." *Stewart v. Houk,* 127 Or. 589, 591, 271 P. 998, 999 (1928) (invalidating Oregon's first automobile guest

plaintiff's pendent claims for negligence and assault and battery are dismissed.

## CONCLUSION

It is unfortunate that an inmate was injured by prison officials attempting to quell a riot and rescue a hostage. Viewing the evidence in the light most favorable to the plaintiff, however, I hold that plaintiff's civil rights claims must fail. The use of deadly force was justified under the unique circumstances of this case. Alternatively, I hold that defendants have a qualified immunity from damages. Similarly, defendants are immune from liability as to the pendent state claims.

Accordingly, the clerk is directed to enter judgment in favor of defendants.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed. R. Civ. Pro. 52(a).

statute). Prior to enactment of the Tort Claims Act in 1967, public bodies were immune from all tort liability. *E.g., Bacon v. Harris,* 221 Or. 553, 352 P.2d 472 (1972). Additionally, employees were immune from tort liability arising from the performance of "discretionary functions." *Jarrett v. Wills,* 235 Or. 51, 54–55, 383 P.2d 995, 997 (1963). By passage of the Oregon Tort Claims Act, the legislature waived immunity with enumerated exceptions. No remedy was abolished. On the contrary, the Act provides redress of grievance which did not before exist. The due process protection of Article I, Section 10 is not proscribed. *See Noonan v. City of Portland,* 161 Or. 213, 88 P.2d 808 (1938) (due process provision does not invalidate an exemption clause in city charter that withholds remedy against city); *Gearin v. Marion County,* 110 Or. 390, 223 P. 929 (1924) (due process provision has no application to a case involving immunity of state or subordinate agency).