James A. NEWBY, Jr., as Personal Representative of the Estate of Clarence "Lee" Newby, Deceased, Plaintiff,

v.

Charles SERVISS, Officer, Michigan Training Unit, Department of Corrections, individually and in his official capacity, Perry Johnson, and Richard A. Handlon, Superintendent, Michigan Training Unit, in his individual and official capacity, Defendants.

Nos. G81–125 CA1, G82–266 CA1.

United States District Court, W.D. Michigan, S.D.

June 21, 1984.

Meeks, Schultz & Archer by Robert W. Archer, Grand Rapids, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen. by Patrick J. Devlin and John M. Cahill, Corrections Div., Lansing, Mich., for defendants.

## OPINION

HILLMAN, District Judge.

Plaintiff's decedent, Clarence Lee Newby, was a duly incarcerated inmate in the custody of the Michigan Department of Corrections and the Michigan Training Unit on July 20, 1979.

Defendant Perry Johnson is, and was in 1979, employed by the State of Michigan as Director of the Michigan Department of Corrections.

Defendant Richard Handlon is, and was in 1979, employed by the State of Michigan as the Superintendent of the Michigan Training Unit, a prison facility under the jurisdiction of the Michigan Department of Corrections.

Defendant Charles Serviss is, and was in 1979, employed by the State of Michigan as a corrections officer at the Michigan Training Unit, a prison facility under the jurisdiction of the Michigan Department of Corrections.

James A. Newby, Jr. (plaintiff), brought this action as the personal representative of the estate of Clarence Lee Newby (Newby), deceased. Plaintiff alleged that defendants Charles Serviss (Serviss), Richard Handlon (Handlon), and Perry Johnson (Johnson) were liable to the estate of Clarence Newby under 42 U.S.C. § 1983 for violation of his rights under the eighth and fourteenth amendments to the United States Constitution. A jury trial was held and plaintiff presented his case during approximately three and one-half days of testimony. At the close of plaintiff's case, all three defendants moved for a directed verdict. A directed verdict on behalf of each of the defendants was granted, and the case was dismissed.

## FACTS

The facts were largely uncontroverted. Because the case was disposed of on defendants' motion for directed verdict, disputed facts were considered in the light most favorable to plaintiff.

On July 20, 1979, Clarence Newby was incarcerated at the Michigan Training Unit (MTU), serving a two and one-half to fifteen year sentence for breaking and entering. He was 22 years old. MTU, located a few miles from Ionia, Michigan, is a medium security institution operated by the Michigan Department of Corrections. It is designed to accommodate 18 to 21 year old felony offenders whose minimum sentences are five years or less. However, according to uncontroverted testimony at trial, many of the inmates in medium security prisons generally, and in MTU specifically, have been convicted of violent felonies. Two parallel fences, ten to twelve feet high, surround the perimeter of MTU. These fences are 16 feet apart. Near the inside fence is an electronic detection system. There are also eight guard towers surrounding the institution. Of the eight towers, only three (towers two, four and seven) are manned at all times and deemed critical. The other towers (one, three, five, six and eight) are irregularly manned.

When a guard tower is manned, one guard is assigned to that tower. Each guard is issued a .30 caliber M-1 carbine rifle. The cartridges used are 110 grain, fully metal-jacketed bullets. Each tower has a microphone and all are on an open channel. If any guard, or the control office, speaks into the microphone, every other guard and the control office hears it at the same time. To use the microphone, a guard must grasp the microphone and press the button on it. To receive a communication, a guard does not have to handle the microphone because of the open channel.

Three guard towers are relevant to the facts of this case, towers two, three and four. The distance between towers two and three is approximately 267 yards, or 800 feet. The distance between towers three and four is approximately 213 yards, or 640 feet. The distance from the front door of the institution to tower two is 100 yards, or 300 feet.

A guard in tower two has a clear view of the area between tower two and the front door of the institution, as well as the area from tower two to tower three. The view from tower four to the fence running between towers two and three and the adjoining area, is largely obstructed by the housing units arranged near that fence. The guard in tower four can only see approximately 50 or 60 yards of the 260-yard fence between towers two and three. This section of the fence, which is visible to the guard in tower four, is located nearest to tower three.

The control office is located in the administration building. It is approximately 80 feet from the main lobby of the entrance to the institution, and it is behind three sliding, barred gates. The main lobby entrance is the closest means of exit from the institution to tower three.

On July 20, 1979, at approximately 10:40 a.m., Newby and a fellow inmate, Henry Olger, attempted to escape from MTU. This escape attempt was first seen by corrections officer Hattie Thorne, who was stationed in tower two. She used her microphone to alert the control office of the escape attempt. Officer Thorne's report of the escape was heard by Charles Serviss, who was stationed in tower four. It was heard at the same time by personnel in the control office. The escape attempt occurred near tower three, which was unmanned at the time. The point of escape was approximately 190 feet, or 63 yards, south of tower three.

When notified by Hattie Thorne of the attempted escape, several MTU personnel left the control office immediately and ran toward the area of the escape. Robert Weber, a corrections officer, was the first person out the front door of the administration building. He ran from the front door of the institution to tower two, followed closely by other MTU personnel. On this day, Michigan State Police Trooper Michael Miller was also in the MTU administration building. He was there to investigate an unrelated complaint. When he heard the report of the escape in progress, Miller left the administration building after obtaining his weapon. He went to his car, which was parked very close to the front door of the administration building, and used it to pursue the escaping inmates.

While Robert Weber, State Trooper Miller and other MTU personnel were proceeding to the area of the escape attempt, Officer Thorne, in tower two, fired three shots at Newby and Henry Olger as they were scaling the perimeter fences. Thorne testified that she only fired after yelling at Newby and Olger to halt. She further testified that the first two of her three shots were warning shots. She had aimed at Newby with her third shot. She then took aim at Newby again, but was unable to fire because her weapon jammed. As she was attempting to clear it in preparation for shooting again, she saw Officer Weber, who had by now rounded tower two, waving and yelling at her to cease firing because he would be running into her line of fire. Subsequently, Officer Thorne did not fire another shot. After Weber rounded tower two, waived off Hattie Thorne, and ran several more yards, he observed Newby scale the outer fence and drop to the ground. At this point, Weber yelled at Newby to halt, and feigned having a weapon in order to discourage Newby from continuing his escape. Newby halted for a few seconds, then continued to run. Weber continued pursuit on foot, followed closely by Miller in his automobile.

The second escaping inmate, Olger, was coming over the outer perimeter fence, quite closely behind Newby. As he dropped to the ground, he ran in the same direction and into the same area as Newby.

When James Trout, a corrections officer, and other MTU personnel came from the

front office and rounded tower two, they could see that they were some distance behind Weber and Miller. At this point, Trout directed the other MTU personnel to set up a perimeter near the MTU rifle range, which is approximately 300 to 400 yards south/south west from the point of the escape. A perimeter near the rifle range has been established on other occasions when an escape occurs on the west side of the institution. Because of this, the men Trout directed to set up the perimeter, needed only brief instructions on how or where to do this.

Such a perimeter is set up because past experiences have demonstrated that inmates who attempt to escape from the west side of MTU generally come out somewhere near the rifle range due to the terrain into which they travel. The terrain is a heavily wooded area with creeks and undergrowth. Because of this terrain an escaping inmate tends to head toward the road and the rifle range located on it.

As MTU personnel were setting up this perimeter, Newby ran from the fence near tower three. As he did so, he came into the view of defendant Serviss, who was in tower four. Defendant Serviss allowed Newby to run several yards to clear the obstructing intersecting fences at tower three, and fired two shots at Newby. According to the uncontroverted evidence at trial, the first shot fired by Serviss was a warning shot. The second shot struck Newby in the neck, leaving him a quadraplegic and allegedly causing his death approximately two and one-half years later. The distance from where Newby was shot and tower four is 276 yards, 830 feet. Newby had run approximately 50 yards from the point he dropped off the outer perimeter fence.

Defendant Serviss stated that after he shot plaintiff, he looked for the second escaping inmate and saw him running away from the fence. At about the same time, he saw Weber on foot and Miller in his patrol car converge on Olger and capture him. Defendant Serviss maintains that it was one to one and one-half minutes after he shot Newby that Weber and Miller arrived in the area in which plaintiff was shot.

Plaintiff disputes that one and one-half minutes passed before Weber and Miller converged on the area where Newby was shot. Plaintiff maintains that Olger was very close behind Newby and that Weber and Miller were very close behind Olger. The evidence at trial was inconclusive as to how far Weber and Miller were behind Newby. For purposes of defendants' motion, I assumed that Weber and Miller may have been closer than one and one-half minutes behind Newby. However, the evidence did not support a finding that Weber and Miller were close enough that they were certain to physically overcome Newby as he ran. Additionally, Serviss's testimony that he didn't see Weber and Miller until after he shot Newby because his view of them was obscured by buildings was uncontradicted. However, although Serviss testified that he didn't know Weber and Miller were in close pursuit, he stated that he did know that MTU's control office would attempt to set up a perimeter to abort the escape attempt.

## DISCUSSION

When considering a motion for a directed verdict, the court must view all evidence in a light most favorable to the party against whom the motion is made, in this case, the plaintiff. The trial court should grant a directed verdict only when it is clear that reasonable people could come to only one conclusion from the evidence. *Bellamy v. Bradley,* 729 F.2d 416 (6th Cir. 1984).

The duties of defendants Johnson and Handlon, as state officers, are different from those of defendant Serviss. Additionally, plaintiff asserts a different theory of liability against Johnson and Handlon than he does against Serviss. The legal standards governing these two theories are distinct. Consequently, I will address first defendant Serviss's motion and then the motions of Handlon and Johnson.

### Defendant Serviss's Motion

In sum, plaintiff asserts that defendant Serviss violated Newby's constitutional rights by using unnecessary, deadly force with deliberate indifference to Newby's physical safety.

■ I decide defendant Serviss's motion against a backdrop of case law which recognizes that internal prison security must normally be left to the discretion of prison officials who alone have access to the totality of facts affecting the entire prison operation. *See Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); *Ridley v. Leavitt,* 631 F.2d 358 (4th Cir. 1980). I also recognize, however, that prison officials are prohibited from using excessive force even when confronted by disorder or disobedience of prison inmates. *Ridley v. Leavitt, supra.* In fact, I am satisfied that whether plaintiff's claim is evaluated under the fourteenth or the eighth amendment, given the facts of this case, Clarence Newby's constitutional rights were the same—to be free from any more force than was reasonably necessary to prevent his escape. *Cf. Albers v. Whitley,* 546 F.Supp. 726 (D.Ore.1982). I am persuaded that plaintiff's evidence would not support a conclusion that the force used by Serviss was excessive, given all the circumstances of this case, or exceeded the broad discretion with which he must be vested to attempt to prevent prison escapes.

I have discovered no precedent addressing precisely the issue presented by this case, i.e., in what circumstances would the use of deadly force to prevent a convicted felon's escape from prison constitute unnecessary and, therefore, excessive force. However, I am satisfied that, given the facts of this case, the use of deadly force appeared reasonably necessary and was, therefore, not excessive. In reaching this result, I am guided primarily by two recent cases dealing with analogous, though not identical, problems.

The first of these is *Garner v. Memphis Police Department,* 710 F.2d 240 (6th Cir. 1983). In *Garner,* the Sixth Circuit decided that Tennessee's fleeing felon statute was unconstitutional under the fourth and fourteenth amendments. The court held that the Tennessee statute did not put sufficient limits on law enforcement officers' use of deadly force. The court stated that before taking the drastic measure of using deadly force as a last resort against a fleeing suspect, officers should have probable cause to believe not simply that the suspect has committed some felony, but that the suspect poses a threat to the safety of the officers or a danger to the community if left at large. The court further noted that the officers may be justified in using deadly force if the suspect has committed a violent crime or if they have probable cause to believe he is armed or he will endanger the physical safety of others if not captured.

■ *Garner* addressed the issue of when deadly force may be used against a *suspect.* In contrast, the instant case presents the situation where the escapee has already been found guilty of one felony and is in the process of committing another. Additionally, many prisoners in the Michigan Training Unit have already been found guilty the commission of a violent felony. Prison guards have no way of distinguishing which inmates have committed violent crimes. Additionally, guards and prison officials have probable cause to believe that any given escapee may be armed or pose a danger to others in the community. An escapee, by virtue of his escape, is a desperate individual and is in the process of committing a felony. I am persuaded that the prevention of a prison escape comes within the circumstances where the Sixth Circuit stated that deadly force may be justified. Applying the principles enunciated in *Garner,* I am convinced that an escaping convicted felon has no constitutional right to be free from the use of deadly force, when deadly force is necessary to prevent or terminate his escape.

This is not to say that prison guards may not be required to fire a warning shot, or to shoot only to disable if possible. However, plaintiff's evidence, even viewed in the

light most favorable to plaintiff, demonstrates that Clarence Newby had been given multiple warnings. Further, the evidence does not support a reasonable conclusion that defendant Serviss knew or had reason to know that Newby's escape could be prevented by means other than the use of deadly force. Nor does it demonstrate that Serviss was in a position to make certain that the force necessarily used would only disable plaintiff.

In *Albers v. Whitley*, 546 F.Supp. 726 (D.Ore.1982), District Judge Panner was confronted with a similar, though not identical, question as that presented by defendants' motions. He was asked to direct a verdict in favor of a defendant correction officer in a civil rights action brought by a prisoner who was shot during a riot at the state penitentiary. There, again in contrast to the facts of this case, the district judge assumed for purposes of the motion that plaintiff did not participate in the creation of the emergency situation. On the contrary, there was evidence that the plaintiff was engaged in an attempt to assist prison officials in bringing the disturbance under control when he was seriously injured. Nevertheless, Judge Panner granted defendant's motion for a directed verdict. The *Albers* court weighed those factors enunciated in *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), namely: the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted. After concluding that the use of some force was necessary and reasonable, the court in *Albers* found the use of deadly force justified because of the following factors: the emergency nature of the situation with its potential for violence, that attempts were made to use less forceful means before resorting to deadly force, and the need to balance the interests of individual prisoners against those of the prison institution.

■ A similar analysis persuades me that plaintiff has failed to establish a prima facie case against defendant Serviss. The starting point of my analysis was that Clarence Newby's injury was unquestionably severe, and the consequences of his escape attempt tragic. However, it is clear that some force was necessary and proper to prevent that escape. The critical question, then, is whether the degree of force used and its resultant injury amounted to a deprivation of Clarence Newby's constitutional rights.

I find as a matter of law that under the circumstances of this case, the use of deadly force was not excessive, and therefore, did not violate Newby's constitutional rights. Here, as in *Albers*, Serviss was confronted with an emergency situation. He had no way of knowing whether Newby was armed or had a history of violence. He was charged with a duty of preventing prisoner escapes. This duty, recognized by Michigan statute (M.C.L.A. § 800.41), arises both from the need to maintain order within the prison and the need to protect the surrounding community from potential violence from prison escapees. In hindsight, we know that Newby had not been convicted of a violent crime and apparently was not armed. Yet there is no evidence, nor does the plaintiff claim, that it was possible for Serviss to know these things at the time he was required to act. Additionally, Serviss did know at the time he fired, that Newby had ignored at least two warning shots. He also knew that two fences, designed to prevent escapes, had not stopped Newby's attempt.

Plaintiff has attempted to establish that Newby's escape could have been terminated either by prison officials in foot pursuit or by the State Trooper, Miller, in his car. However, even viewing plaintiff's evidence in the light most favorable to plaintiff, whether this apprehension was likely is not certain. Plaintiff has introduced no evidence from which to conclude that Serviss knew, or should have known, that there was any certainty Newby could be apprehended by the officers pursuing on foot or by the state trooper in his car. This is not a situation where Newby had stopped to surrender, headed back to the prison, or

even where other prison officials had physically overcome him. Plaintiff asks the court to set a standard that a prison guard must refrain from the use of deadly force if there is any possibility that alternate means might, at a later time, terminate an escape. I do not believe this is a standard with which prison officials or the public can live.

Plaintiff also claims that Serviss was required to shoot to only disable Newby and did not do so. Plaintiff's ballistics expert testified that a shot from Serviss's position aimed at Newby's lower legs would not have hit Newby at all. However, this does not advance plaintiff's case. First, Serviss was required to shoot to disable Newby *if possible.* There is no evidence that Serviss was in a position to shoot with any great degree of accuracy. He was in a tower over 250 yards from Newby, who was running. Even plaintiff's own witness, an expert marksman, testified that given the relative locations of Serviss and Newby, the fact that Newby was running, and the weapon used by Serviss, he (the witness) could not have fired with any appreciable degree of accuracy. There is no evidence that Serviss acted with any intent to grievously injure Newby. Again, plaintiff asks for an impracticable standard: that a prison guard must allow a prisoner to escape unless he is in a position to aim with accuracy and a certainty that he will only disable the escapee. I have found no legal authority in support of such a standard, nor do I think it wise public policy. An inmate desperate enough to climb two fences 10 to 12 feet high and capped with barbed wire, dodge rifle fire, ignore orders to halt, and race for nearby woods, demonstrates an obvious determination to take all steps to avoid capture. His potential threat to the safety or perhaps lives of innocent citizens living near the prison or to drivers on the highway adjacent to the prison is obvious. The policy of the State of Michigan recognizing this danger is reflected in M.C.L.A. § 800.41, authorizing the use of all reasonable force to apprehend fleeing prison inmates.

### Motions of Johnson and Handlon

■ Essentially, plaintiff's complaint against Handlon, in his role as superintendent of MTU, and Johnson, in his role as director of the Michigan Department of Corrections, is that each of those defendants allegedly failed to provide Clarence Newby with safe conditions of confinement. Initially, I note that liability against supervisory officials may be imposed only if the actions or non-actions of those officials proximately cause a constitutional deprivation. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). I have held that Clarence Newby was not subjected to excessive force and, therefore, was not deprived of his constitutional rights. Since no deprivation occurred, defendants Johnson and Handlon cannot be held liable for causing that deprivation. However, because a distinction may be drawn between Newby's right to be free from excessive force and his right to reasonably safe conditions of confinement, I have independently evaluated plaintiff's claim against Johnson and Handlon. I do so because the disposal of plaintiff's case on defendants' motions for directed verdict entitled plaintiff to the most careful scrutiny of his allegations.

■ The right to personal security or safety is a liberty interest protected substantively by the due process clause of the fourteenth amendment. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). That right is not extinguished by lawful confinement, even for penal purposes. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). In *Youngberg, supra,* the Supreme Court held that the proper standard applied to those in a professional capacity for determining whether the state has adequately protected such rights, is whether professional judgment was in fact exercised. *Youngberg, supra,* 457 U.S. at 323, 102 S.Ct. at 2462. The decisions made by qualified professionals are presumptively valid. As will be discussed below, plaintiff did not submit evidence from which reasonable people could conclude that either defendant

Handlon or defendant Johnson failed to exercise any professional judgment with respect to Clarence Newby's right to reasonably safe conditions while confined.

 Newby was also entitled to be free from an unreasonable risk of injury by reason of his eighth amendment right to be free from cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Initially, I note that it is questionable whether an alleged failure to ensure that an inmate will not be injured while attempting to escape could ever be said to expose him to an unreasonable risk. Second, to state a claim under section 1983 for deprivation of eighth amendment rights, plaintiff must prove "acts or omissions sufficiently harmful to evidence deliberate indifference" to plaintiff's physical well being. *Estelle v. Gamble, supra* at 106, 97 S.Ct. at 292. No reasonable juror could conclude from plaintiff's evidence that defendants Handlon or Johnson engaged in action or inaction constituting such deliberate indifference.

 Plaintiff claims that defendants Johnson and Handlon were deliberately indifferent to Clarence Newby's safety and failed to exercise professional judgment in seeing that he had reasonably safe conditions of confinement. Specifically, Newby alleges that Johnson and Handlon failed to reduce the possibility of escape attempts and, further, did not take sufficient precautions to ensure that if a prisoner did attempt to escape, it would not be necessary to use greater than disabling force. While I am not prepared to find that the use of deadly force against an escaping inmate could never violate his constitutional rights, I am convinced that those residual rights to physical safety are minimal. Deadly force may be used as a last resort to prevent or terminate a prison escape. What is meant by "last resort" is that the use of deadly force must appear reasonably necessary to prevent or terminate the escape. A number of precautions and procedures taken at MTU to reduce both the likelihood of escape attempts, and the use of deadly force to terminate an attempt,

demonstrate that defendants Handlon and Johnson were neither deliberately indifferent nor failed to exercise any professional judgment with respect to the danger posed by inmates' escapes. Two fences, one ten feet and the other 12 feet, both topped with barbed wire and one covered by a mesh screen at the top, were utilized to prevent escape. Guards were stationed in towers around the prison periphery to further discourage escape attempts. Prison officials were instructed, if possible, to fire a warning shot before taking aim at an escaping prisoner. Prison personnel were further instructed that, again if possible, to attempt to shoot to only disable the escaping prisoner.

Plaintiff did introduce expert testimony criticizing some of the methods used at MTU relative to escape prevention and termination. However, even if plaintiff's expert opinion is accepted as true, at most it tends to show that there may have been ways to further reduce the potential for prison escapes and the risk that it would be necessary to use deadly force to terminate an escape. Plaintiff seeks to apply a standard that would require defendants Johnson and Handlon to reduce the risk to escaping inmates as much as is theoretically feasible. This is clearly not the law. In *Youngberg v. Romeo, supra*, the Supreme Court declined to require professionals acting on behalf of the State to demonstrate that they had exercised the best professional judgment theoretically possible, lest they be liable for violations of the United States Constitution. Rather, the Court limited judicial review of those professionals' decisions to a determination of whether any professional judgment was in fact exercised. For the reasons discussed above, I find that it was.

### Good Faith Immunity

 Even were I persuaded that there was a factual question for the jury as to whether Clarence Newby was deprived of rights secured to him by the Constitution, each of the defendants is entitled to qualified good faith immunity from liability. In

**600**

Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* 102 S.Ct. at 2738.

The Model Penal Code § 3.07 (1962), cited in *Mattis v. Schnarr,* 547 F.2d 1007 (8th Cir.1976), provides in subsection (3):

"... a guard or other person authorized to act as a peace officer is justified in using any force, including deadly force, which he believes to be immediately necessary to prevent the escape of a person from a jail, prison, or other institution for the detention of persons charged with or convicted of a crime."

I have discovered no legal authority extending to an escaping convicted felon any greater protection than that provided by the Model Penal Code. Additionally, I have discovered no authority, nor has plaintiff argued that any exists, protecting an escaping convicted felon from the use of deadly force if that force appears reasonably necessary to prevent or terminate his escape. The policies and practices of defendants Handlon and Johnson reflect the requirement that deadly force not be used unless it appears reasonably necessary. Plaintiff has introduced no evidence from which a jury could find that defendant Serviss did not believe his shot at Newby was reasonably necessary to terminate his escape. In sum, there is no evidence from which a jury could find that a reasonable person would have known that using deadly force under the circumstances of this case would violate Newby's constitutional or statutory rights. Therefore, all three defendants are entitled to a qualified good faith immunity from liability.

*Plaintiffs' Pendent State Law Claims*

██ I have also dismissed plaintiff's pendent state law claims. I am convinced that the same factors precluding a finding of a constitutional violation defeat plaintiff's state law claims. Law enforcement officers are immune from tort liability when acting within the scope of their official duties, i.e., in good faith and with probable cause. *Blackman v. Cooper,* 89 Mich. App. 639, 280 N.W.2d 620, 621 (1979).

Accordingly, the motions for directed verdicts are granted on behalf of each of the defendants and the case is dismissed.